George L. KREGOS, d/b/a American Sports Wire, Plaintiff–Appellant,

v.

The ASSOCIATED PRESS and Sports Features Syndicate, Inc., Defendants–Appellees.

No. 337, Docket 90–7469.

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1990.

Decided June 11, 1991.

Mark P. Stone, Stamford, Conn., for plaintiff-appellant.

Nicholas L. Coch, New York City (Anderson Kill Olick & Oshinsky, Walter G. Marple, Jr., and David A. Einhorn, on the brief), for defendant-appellee Associated Press.

Norman E. Lehrer, Cherry Hill, N.J., for defendant-appellee Sports Features Syndicate, Inc.

Before NEWMAN and PRATT, Circuit Judges, and SWEET, District Judge.[*]

JON O. NEWMAN, Circuit Judge:

The primary issue on this appeal is whether the creator of a baseball pitching form is entitled to a copyright. The appeal requires us to consider the extent to which the copyright law protects a compiler of information. George L. Kregos appeals from the April 30, 1990, judgment of the District Court for the Southern District of New York (Gerard L. Goettel, Judge) dismissing on motion for summary judgment his copyright and trademark claims against the Associated Press ("AP") and Sports Features Syndicate, Inc. ("Sports Features"). We affirm dismissal of the trade-

---

[*] The Honorable Robert W. Sweet of the District Court for the Southern District of New York, sitting by designation.

mark claims, but conclude that Kregos is entitled to a trial on his copyright claim, though the available relief may be extremely limited.

### Facts

The facts are fully set forth in Judge Goettel's thorough opinion, 731 F.Supp. 113 (S.D.N.Y.1990). The reader's attention is particularly called to the appendices to that opinion, which set forth Kregos' pitching form and the allegedly infringing forms. *Id.* at 122–24 (Appx. 1–4). Kregos distributes to newspapers a pitching form, discussed in detail below, that displays information concerning the past performances of the opposing pitchers scheduled to start each day's baseball games. The form at issue in this case, first distributed in 1983, is a redesign of an earlier form developed by Kregos in the 1970's. Kregos registered his form with the Copyright Office and obtained a copyright. Though the form, as distributed to subscribing newspapers, includes statistics, the controversy in this case concerns only Kregos' rights to the form without each day's data, in other words, his rights to the particular selection of categories of statistics appearing on his form.

In 1984, AP began publishing a pitching form provided by Sports Features. The AP's 1984 form was virtually identical to Kregos' 1983 form. AP and Sports Features changed their form in 1986 in certain respects, which are discussed in part I(d) below.

Kregos' 1983 form lists four items of information about each day's games—the teams, the starting pitchers, the game time, and the betting odds, and then lists nine items of information about each pitcher's past performance, grouped into three categories. Since there can be no claim of a protectable interest in the categories of information concerning each day's game, we confine our attention to the categories of information concerning the pitchers' past performances. For convenience, we will identify each performance item by a number from 1 to 9 and use that number whenever referring to the same item in someone else's form.

The first category in Kregos' 1983 form, performance during the entire season, comprises two items—won/lost record (1) and earned run average (2). The second category, performance during the entire season [1] against the opposing team at the site of the game, comprises three items—won/lost record (3), innings pitched (4), and earned run average (5). The third category, performance in the last three starts, comprises four items—won/lost record (6), innings pitched (7), earned run average (8), and men on base average (9). This last item is the average total of hits and walks given up by a pitcher per nine innings of pitching.

It is undisputed that prior to Kregos' 1983 form, no form had listed the same nine items collected in his form. It is also undisputed that some but not all of the nine items of information had previously appeared in other forms. In the earlier forms, however, the few items common to Kregos' form were grouped with items different from those in Kregos' form. Siegel's 1978 form contained won/lost record (1) and earned run average for the season

---

1. There is some uncertainty as to the time period to which the data in this category pertain. In his deposition, Kregos says the data are "year to date," (J.A. 298), and the numbers in the won/lost column are too low to be career figures (it is not likely that by 1984 Steve Carlton had pitched at Philadelphia only 8 innings against Cincinnati in his career, see 731 F.Supp. at 122, appx. 1; the numbers more likely reflect one season). Yet the numbers may reflect season performance for the previous season, at least for games played early in the season, before current season data is significant. For example, Larry Gura is shown as having a won/lost record of 4–0 against all opponents in 1984 and a won/lost record of 0–2 against the day's opponent at the site of the day's game. Obviously, his "at site" numbers cannot be for the 1984 season, but might pertain to the previous season. An example of Kregos' earlier form, printed on June 11, 1980, shows "1979" as the heading for "at site" data. (J.A. 76). Judge Goettel characterized Kregos' "at site" data as pertaining to the pitcher's performance "during his career against the scheduled opponent." 731 F.Supp. at 114. Since the matter has not been resolved by fact-finding at trial, we will accept, for purposes of this appeal, Kregos' deposition statement that the "at site" data pertain to the current season.

(2), but contained no "at site" information (3, 4, 5) and no information for recent starts (6, 7, 8, 9). It contained only two of Kregos' nine items (1, 2). Fratas' 1980 form contained "at site" information for the previous season (differing from Kregos' "at site" information for the current season (3, 4, 5)) and contained no information for recent starts (6, 7, 8, 9). It contained only two of Kregos' nine items (1, 2). Eckstein's 1981 form, the only prior form to contain information for recent starts (using two of the four items in Kregos' form (6, 7)) lacked the third and fourth "recent starts" items (earned run average and men on base average (8, 9)), contained "at site" information only for won/lost record and did not report that data for the current season against the opposing team,[2] and lacked earned run average for the season (2). It contained only three of Kregos' nine items (1, 6, 7).

Kregos' item (9), men on base average in recent starts, had not previously appeared anywhere. However, a supplier for the Associated Press Syndicate, Inc. had distributed on a weekly basis the men on base average for every pitcher for the entire season, rather than for the most recent three starts, as in Kregos' form.

*District Court decision.* The District Court granted summary judgment for the defendants on both Kregos' copyright and trademark claims. On the copyright side of the case, the Court ruled that Kregos lacked a copyrightable interest in his pitching form on three grounds. First, the Court concluded that Kregos' pitching form was insufficiently original in its selection of statistics to warrant a copyright as a compilation. Second, the Court concluded that, in view of the limited space available for displaying pitching forms in newspapers, the possible variations in selections of pitching statistics were so limited that the idea of a pitching form had merged into its expression. Third, the Court ruled that Kregos' pitching form was not entitled to a copyright because of the so-called "blank

form" doctrine. On the trademark side of the case, the Court granted summary judgment for the defendants on the ground that Kregos' trademark claims encountered, as a matter of law, a functionality defense.

## Discussion

### I. Copyright Claim

A. *Copyright for a Compilation of Facts.* The basic principles concerning copyright protection for compilations of facts are clear and have recently been authoritatively restated in the Supreme Court's decision rejecting copyright protection for telephone book white pages. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* — U.S. —, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ("*Feist*"). "A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement. In no event may copyright extend to the facts themselves." *Id.* at —, 111 S.Ct. at 1290. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* at —, 111 S.Ct. at 1287 (citation omitted).

In principle, this "independent creation" sense of the word "original" applies to the originality required to entitle a selection of factual information to a copyright. "A compiler may settle upon a selection or arrangement that others have used; novelty is not required. Originality requires only that the author make the selection or arrangement independently (*i.e.,* without copying that selection or arrangement from another work)...." *Id.* at —, 111 S.Ct. at 1294. In practice, however, as the Court in *Feist* made clear, application of the "originality" standard to compilations of facts is narrowed somewhat by the requirement of "some minimal level of creativity." *Id.* In *Feist,* for example, it would have

---

**2.** It is not clear from the record whether Eckstein's "at site" data reflects won/lost record against the day's opponent for the previous season or against all opponents during the current season. In any event the won/lost records Eckstein includes are not the "at site" results against the day's opponent during the current season, which is the data Kregos includes.

availed the compiler nothing to have persuaded a fact-finder that it came upon the idea of "selecting" all the telephone subscribers in town and "arranging" their names in alphabetical order without copying these features from any preexisting work. The widespread prior existence of white page lists of all telephone subscribers in a community, arranged alphabetically, precluded, as a matter of law, a finding of the requisite creativity. The white pages were deemed "entirely typical" and "garden-variety." *Id.* at ——, 111 S.Ct. at 1296. The selection of listings "could not be more obvious." *Id.* And "there is nothing remotely creative about arranging names alphabetically in a white pages directory.... It is not only unoriginal, it is practically inevitable." *Id.*

■ Thus, as to compilations of facts, independent creation as to selection and arrangement will not assure copyright protection; the requirement of minimal creativity becomes an important ingredient of the test for copyright entitlement. "[T]he selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever." *Id.*

Prior to *Feist,* we had applied these principles to require some minimal level of creativity in two fairly recent cases that illustrate compilations of facts one of which is and one of which is not entitled to a copyright, *Eckes v. Card Prices Update,* 736 F.2d 859 (2d Cir.1984), and *Financial Information, Inc. v. Moody's Investors Service,* 808 F.2d 204 (2d Cir.1986) ("*FII*"), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). In *Eckes* we upheld a District Court's finding, made after trial, that a selection of 5,000 out of 18,000 baseball cards to be considered "premium" was entitled to a copyright. *Eckes,* 736 F.2d at 863. In *FII* we upheld a District Court's finding, also made after trial, that the listing of five items of information concerning municipal bond calls lacked sufficient selection to warrant a copyright; in almost all instances, the five items for the various bond issues had all appeared in "tombstone" ads, and only "minor additional research" was needed to complete the listings. *FFI,* 808 F.2d at 208.

■ Kregos' pitching form presents a compilation of facts that falls between the extremes illustrated by *Eckes* and *FFI.* Kregos has selected nine items of information concerning a pitcher's performance. The universe of known facts available only from inspection of box scores of prior games is considerably greater than nine, though perhaps not as great as the quantity of 18,000 cards in *Eckes.* For example, Kregos could have selected past performances from any number of recent starts, instead of using the three most recent starts. And he could have chosen to include strikeouts, walks, balks, or hit batters. By consulting play-by-play accounts of games, instead of box scores, he could have counted various items such as the number of innings in which the side was retired in order, or in which no runner advanced as far as second base. Or he could have focused on performance under pressure by computing the percentage of innings in which a runner scored out of total innings in which a runner reached second base, and he could have chosen to calculate this statistic for any number of recent starts. In short, there are at least scores of available statistics about pitching performance available to be calculated from the underlying data and therefore thousands of combinations of data that a selector can choose to include in a pitching form.[3]

■ It cannot be said as a matter of law that in selecting the nine items for his pitching form out of the universe of available data, Kregos has failed to display enough selectivity to satisfy the requirement of originality. Whether in selecting his combination of nine items he has displayed the requisite degree of creativity is a somewhat closer question. Plainly he has done better than the compiler in *FFI* who "selected" only the five facts about bond calls already grouped together in nearly all tombstone ads. Judge Goettel

---

**3.** If the universe of available data included even 20 items and a selector was limited to 9 items, there would be 167,960 combinations of items available.

was persuaded to rule against Kregos, at least in part, because "most of the statistics ... had been established in previously existing forms." 731 F.Supp. at 118. But that observation is largely irrelevant to the issue of whether Kregos' *selection* of statistics displays sufficient creativity to warrant a copyright. Nearly all copyrighted compilations of facts convey facts that have been published elsewhere. Each of the cards selected for the "premium" category in *Eckes* had previously been published. To hold a valid copyright, a compiler of facts need not be a discoverer of facts. Indeed, any discovered fact, or, in Kregos' case, any newly devised statistic, would not, in and of itself, be eligible for copyright protection.

The prior publication of some of the statistics on Kregos' form might indicate, however, that his selection is not sufficiently different from those grouped in earlier publications to satisfy minimal creativity. That conclusion cannot rest on just the prior appearance of the statistics Kregos chose to use, but might rest on the prior appearance of a *selection* of those statistics that either is identical to Kregos' selection or varies from his only to a trivial degree. In that event, the first issue would be whether Kregos could demonstrate originality, *i.e.*, persuade the trier that he had not copied from the similar selection. Even if Kregos could satisfy that burden, the issue would then arise as to whether the previously published selections of statistics had reached the point where it could be said that Kregos' selection was insufficiently creative, or in the words of *Feist*, "entirely typical," "garden-variety," or "obvious." In view of the variety of pitching forms disclosed in the record, it is unlikely that such a conclusion could be reached and certainly could not be reached as a matter of law.

But these issues are not even likely to arise because the record discloses no prior pitching form with more than three of the pitching performance statistics that are included in Kregos' selection of nine statistics. There is no prior form that is identical to his nor one from which his varies in only a trivial degree. The validity of his

copyright in a compilation of facts cannot be rejected as a matter of law for lack of the requisite originality and creativity.

B. *Idea/Expression Merger.* The fundamental copyright principle that only the expression of an idea and not the idea itself is protectable, *see Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954), has produced a corollary maxim that even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself. *See Educational Testing Services v. Katzman*, 793 F.2d 533, 539 (3d Cir.1986); *Toro Co. v. R & R Products Co.*, 787 F.2d 1208, 1212 (8th Cir.1986). Our Circuit has considered this so-called "merger" doctrine in determining whether actionable infringement has occurred, rather than whether a copyright is valid, *see Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 916 (2d Cir.1980), an approach the Nimmer treatise regards as the "better view." *See 3 Nimmer on Copyright* § 13.03[B][3] at 13–58 (1990). Assessing merger in the context of alleged infringement will normally provide a more detailed and realistic basis for evaluating the claim that protection of expression would inevitably accord protection to an idea.

Determining when the idea and its expression have merged is a task requiring considerable care: if the merger doctrine is applied too readily, arguably available alternative forms of expression will be precluded; if applied too sparingly, protection will be accorded to ideas. Recognizing this tension, courts have been cautious in applying the merger doctrine to selections of factual information, *see Educational Testing Services*, 793 F.2d at 540 (doctrine inapplicable to selection of test questions); *Toro Co.*, 787 F.2d at 1212 (doctrine inapplicable to selection of data for numbering parts), though the doctrine has been applied on occasion to selections of categories of data, *see, e.g., Matthew Bender & Co. v. Kluwer Law Book Publishers, Inc.*, 672 F.Supp. 107, 110 (S.D.N.Y.1987) (categories of data concerning personal injury awards).

In one sense, every compilation of facts can be considered to represent a merger of an idea with its expression. Every compiler of facts has the idea that his particular selection of facts is useful. If the compiler's idea is identified at that low level of abstraction, then the idea would always merge into the compiler's expression of it. Under that approach, there could never be a copyrightable compilation of facts. However, if the idea is formulated at a level of abstraction above the particular selection of facts the compiler has made, then merger of idea and expression is not automatic. Even with an idea formulated at a somewhat high level of abstraction, circumstances might occur where the realistic availability of differing expressions is so drastically limited that the idea can be said to have merged in its expression.

In this case, Judge Goettel understood Kregos' idea to be "to publish an outcome predictive pitching form." 731 F.Supp. at 119. In dissent, Judge Sweet contends that Kregos' idea is that the nine statistics he has selected are the most significant ones to consider when attempting to predict the outcome of a baseball game. Unquestionably, if that is the idea for purposes of merger analysis, then merger of that idea and its expression has occurred—by definition.

Though there is room for fair debate as to the identification of the pertinent idea whenever merger analysis is applied to a compilation of facts, we think the "idea" in this case is the one as formulated by Judge Goettel. Kregos has not devised a system that he seeks to withdraw from the public domain by virtue of copyright. He does not present his selection of nine statistics as a method of predicting the outcome of baseball games. His idea is that of "an outcome predictive pitching form" in the general sense that it selects the facts that he thinks newspaper readers should consider in making their own predictions of outcomes. He does not purport to weight the nine statistics, much less provide a method for comparing the aggregate value of one pitcher's statistics against that of the opposing pitcher in order to predict an outcome or even its probability of occurring. He has not devised a system, as had the deviser of a bookkeeping system in *Baker v. Selden*, 101 U.S. (11 Otto) 99, 25 L.Ed. 841 (1879). He has compiled facts, or at least categories of facts.

Though formulating the idea as "an outcome predictive pitching form," Judge Goettel applied the merger doctrine, concluding that the idea of selecting outcome predictive statistics to rate pitching performance was capable of expression in only a very limited number of ways. He thought the case more attracted by *Matthew Bender*, involving categories of data for personal injury awards, than by the cases involving categories of statistics for performances of race horses, see *Wabash Publishing Co. v. Flanagan*, No. 89–C–1923 (N.D.Ill. Apr. 3, 1989) (1989 WL 32939); *Triangle Publications, Inc. v. New England Newspaper Publishing Co.*, 46 F.Supp. 198, 201–02 (D.Mass.1942); see also *Triangle Publications, Inc. v. Sports Eye, Inc.*, 415 F.Supp. 682, 684 (E.D.Pa. 1976). In *Matthew Bender*, Judge Conner concluded that the categories in the plaintiff's chart (amount, case, plaintiff, event, injury, and relevant data) were "the only sensible ones which could have been used to compile the data." 672 F.Supp. at 112. That observation may well have been so as to categories of data for personal injury awards, but we think the same cannot be said of categories of pitching statistics.

As the various pitching forms in the record indicate, the past performances of baseball pitchers can be measured by a variety of statistics, as can the past performances of race horses. Kregos' selection of categories includes three statistics for the pitcher's current season performance against the day's opponent at the site of the day's game; other charts select "at site" performance against the opponent during the prior season, and some select performance against the opponent over the pitcher's career, both home and away. Some charts include average men on base per nine innings; others do not. The data for most recent starts could include whatever number of games the compiler

thought pertinent. These variations alone (and there are others) abundantly indicate that there are a sufficient number of ways of expressing the idea of rating pitchers' performances to preclude a ruling that the idea has merged into its expression.

In reaching this conclusion, we confess to some unease because of the risk that protection of selections of data, or, as in this case, categories of data, have the potential for according protection to ideas. Our concern may be illustrated by an example of a doctor who publishes a list of symptoms that he believes provides a helpful diagnosis of a disease. There might be many combinations of symptoms that others could select for the same purpose, but a substantial question would nonetheless arise as to whether that doctor could obtain a copyright in his list, based on the originality of his selection. If the idea that the doctor is deemed to be expressing is the general idea that the disease in question can be identified by observable symptoms, then the idea might not merge into the doctor's particular expression of that idea by his selection of symptoms. That general idea might remain capable of many other expressions. But it is arguable that the doctor has conceived a more precise idea—namely, the idea that his selection of symptoms is a useful identifier of the disease. That more limited idea can be expressed only by his selection of symptoms, and therefore might be said to have merged into his expression. Thus, as with the idea/expression dichotomy itself, *see Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930) (Judge Learned Hand's formulation of the "abstractions test"), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), application of the doctrine of an idea merging with its expression depends on the level of abstraction at which the idea is formulated.

As long as selections of facts involve matters of taste and personal opinion, there is no serious risk that withholding the merger doctrine will extend protection to an idea. That was surely the case with the selection of premium baseball cards in *Eckes*. It is also true of a selection of prominent families for inclusion in a social directory. *See Social Register Ass'n v. Murphy*, 128 F. 116 (C.C.D.R.I.1904); *see also New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F.Supp. 217, 222 n. 2 (D.N.J.1977). However, where a selection of data is the first step in an analysis that yields a precise result or even a better-than-average probability of some result, protecting the "expression" of the selection would clearly risk protecting the idea of the analysis.

Kregos' pitching form is part way along the continuum spanning matters of pure taste to matters of predictive analysis. He is doing more than simply saying that he holds the opinion that his nine performance characteristics are the most pertinent. He implies that his selections have some utility in predicting outcomes. On the other hand, he has not gone so far as to provide a system for weighing the combined value of the nine characteristics for each of two opposing pitchers and determining a probability as to which is more likely to win. Like the compilers of horse racing statistics, Kregos has been content to select categories of data that he obviously believes have some predictive power, but has left it to all sports page readers to make their own judgments as to the likely outcomes from the sets of data he has selected. His "idea," for purposes of the merger doctrine, remains the general idea that statistics can be used to assess pitching performance rather than the precise idea that his selection yields a determinable probability of outcome.[4] Since there are various ways of expressing that general idea, the merger doctrine need not be applied to assure that the idea will remain in the public domain.

---

**4.** The merger doctrine might be applicable even in some situations where a precise outcome, or the precise probability of an outcome, has not been determined. The doctor whose list of symptoms provides a reliable basis for predicting that a disease is more likely to be present than in the population generally might well be precluded from copyright protection in his selection, even though he makes no estimate as to the degree of predictive power of his list of symptoms.

C. *"Blank Form" Doctrine.* The District Court also ruled that Kregos could not obtain a valid copyright in his pitching form because of the so-called "blank form" doctrine. The doctrine derives from the Supreme Court's decision in *Baker v. Selden, supra.* The Court there denied copyright protection to blank forms contained in a book explaining a system of double-entry bookkeeping. The forms displayed an arrangement of columns and headings that permitted entries for a day, a week, or a month to be recorded on one page or two facing pages. The Court made clear that the author could not obtain copyright protection for an "art" that "might or might not have been patented" and reasoned that since the "art" was available to the public, "the ruled lines and headings of accounts must necessarily be used as incident to it." *Id.* at 104. Then, in a concluding statement that is susceptible to overreading, the Court said that "blank account-books are not the subject of copyright." *Id.* at 107.

Though there are some statements suggesting broadly that no blank forms are copyrightable, *see Bibbero Systems, Inc. v. Colwell Systems, Inc.,* 893 F.2d 1104, 1106–07 (9th Cir.1990), *amended, reh'g denied,* 1990 WL 1285, 1990 U.S.App.LEXIS 2562; *M.M. Business Forms Corp. v. UARCO, Inc.,* 472 F.2d 1137, 1139 (6th Cir.1973), many courts have recognized that there can be protectable elements of forms that include considerable blank space.[5] *See, e.g., Harcourt, Brace & World, Inc. v. Graphic Controls Corp.,* 329 F.Supp. 517, 524 (S.D.N.Y.1971) (answer sheets); *Norton Printing Co. v. Augustana Hospital,* 155 U.S.P.Q. 133 (N.D. Ill.1967) (laboratory test forms). *See generally Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.,* 797 F.2d 1222, 1242–43 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987).

The regulations of the Copyright Office are careful to preclude copyright registration to:

> Blank forms, such as … account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information *and do not in themselves convey information;*

37 C.F.R. § 202.1(c) (1990) (emphasis added).

■ Of course, a form that conveys no information and serves only to provide blank space for recording information contains no expression or selection of information that could possibly warrant copyright protection. *See, e.g., John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 971–72 (11th Cir.1983) (check stubs). At the same time, it should be equally obvious that a writing that does contain a selection of categories of information worth recording, sufficiently original and creative to deserve a copyright as a compilation of facts, cannot lose that protection simply because the work also contains blank space for recording the information. When the Copyright Office denies a copyright to scorecards or diaries that "do not in themselves convey information," it must be contemplating works with headings so obvious that their selection cannot be said to satisfy even minimal creativity (a baseball scorecard with columns headed "innings" and lines headed "players"; a travel diary with headings for "cities" "hotels," and "restaurants"). Such a work conveys no information, not just because it contains blanks, but because its selection of headings is totally uninformative. On the other hand, if a scorecard or diary contained a group of headings whose selection (or possibly arrangement) displayed cognizable creativity, the author's choice of those headings would convey to users the information that this group of categories was something out of

---

5. We are concerned with protectable elements in the selection (and perhaps arrangement) of the categories of information to be recorded on the forms. There is widespread agreement that a work containing a blank form may be copyrightable because of the protectable elements of the textual matter accompanying the form. *See*

*Bibbero Systems,* 893 F.2d at 1107; *Edwin K. Williams & Co. v. Edwin K. Williams & Co.— East,* 542 F.2d 1053, 1061 (9th Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977); *Continental Casualty Co. v. Beardsley,* 253 F.2d 702, 704 (2d Cir.), *cert. denied,* 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958).

the ordinary. *See 1 Nimmer on Copyright* § 2.18[C][1] at 2–201 (1990) ("Thus books intended to record the events of baby's first year, or a record of a European trip, or any one of a number of other subjects, *may* evince considerable originality in suggestions of specific items of information which are to be recorded, and in the arrangement of such items.") (emphasis added; footnote omitted).

The Ninth Circuit has rejected this approach, believing that the rule of cases like *Norton Printing* "is potentially limitless." *Bibbero Systems*, 893 F.2d at 1107. In the Ninth Circuit's view, "[a]ll forms seek only certain information, and, by their selection, convey that the information sought is important." *Id.* With deference, we suggest that this critique of *Norton Printing* and other cases recognizing a copyright in the selection of categories of information for forms is not well taken. All forms may convey that the information called for is important (or at least worth recording), but the form-maker does not necessarily display even minimal creativity by selecting categories of "important" information. The principle of cases like *Norton Printing* is not limitless because courts are obliged to determine as to forms, as with all compilations of information, whether the author's selection of categories of data to be recorded displays at least minimal creativity. The check stub in *Clarke Checks* was plainly deficient in this regard. Whether the forms in *Bibbero Systems* and *Norton Printing* displayed the requisite creativity are matters of fair dispute. But all forms need not be denied protection simply because many of them fail to display sufficient creativity.

■ In the pending case, once it is determined that Kregos' selection of categories of statistics displays sufficient creativity to preclude a ruling as a matter of law that it is not a copyrightable compilation of information, that same conclusion precludes rejecting his copyright as a "blank form."[6]

■ D. *Extent of Protection.* Our ruling that Kregos' copyright claim sur-

vives defendants' motion for summary judgment does not, of course, mean that he will necessarily obtain much of a victory. "Even if a work qualifies as a copyrightable compilation, it receives only limited protection. . . . [C]opyright protects only the elements that owe their origin to the compiler—the selection, coordination, and arrangement of facts." *Feist,* —— U.S. at ——, 111 S.Ct. at 1294. If Kregos prevails at trial on the factual issues of originality and creativity, he will be entitled to protection only against infringement of the protectable features of his form. Only the *selection* of statistics might be entitled to protection. We agree entirely with Judge Goettel that nothing in Kregos' *arrangement* of the selected statistics displays the requisite creativity. As to the arrangement, Kregos' form is surely a "garden-variety" pitching form. The statistics are organized into the "obvious" arrangement of columns, and the form follows the pattern of most other forms: the statistics are organized into three groups, first the statistics about each pitcher's performance for the season, then the statistics about the pitcher's performance against the day's opponent, and finally the statistics concerning the pitcher's recent starts.

■ Even as to the *selection* of statistics, if Kregos establishes entitlement to protection, he will prevail only against other forms that can be said to copy his selection. That would appear to be true of the AP's 1984 form, which, as Judge Goettel noted, is "identical in virtually every sense to plaintiff's form." 731 F.Supp. at 115. Whether it is also true of the AP's current form, revised in 1986, is far less certain. That form contains six of Kregos' nine items (1, 2, 6, 7, 8, 9). It also includes four items that Kregos does not have. Three of these items concern performance against the day's opposing team—won-lost record, innings pitched, and earned run average; though these three statistics appear on Kregos' form, the AP's 1986 form shows data for the current season both home and away, whereas Kregos' form shows data

---

6. We agree with Judge Goettel that whether the form is copyrightable is unaffected by the fact that the form is to be used by newspapers, rather than by newspaper purchasers.

for the pitcher's current season at the site of that day's game. The fourth item on the AP's 1986 form and not on Kregos' form shows the team's record in games started by that day's pitcher during the season.

The reason for doubting that the AP's 1986 form infringes Kregos' form arises from the same consideration that supports Kregos' claim to a copyright. Kregos can obtain a copyright by displaying the requisite creativity in his selection of statistics. But if someone else displays the requisite creativity by making a selection that differs in more than a trivial degree, Kregos cannot complain. Kregos contends that the AP's 1986 form makes insignificant changes from its 1984 form.[7] But Kregos cannot have it both ways. If his decision to select, in the category of performance against the opposing team, statistics for the pitcher's current season at the site of today's game displays, in combination with his other selections, enough creativity to merit copyright protection, then a competitor's decision to select in that same category performance statistics for the pitcher's season performance both home and away may well insulate the competitor from a claim of infringement. Thus, though issues remain to be explored before any determination can be made, it may well be that Kregos will have a valid claim only as to the AP's 1984 form.[8]

## II. Trademark Claims

 A. *Infringement*. In his complaint Kregos alleged that his form "has become recognized as an indication of source" and further alleged that the defendants' forms are likely to cause confusion as to origin, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988). As the District Court recognized, Kregos

appears to be claiming infringement of trade dress, 731 F.Supp. at 121 n. 17. The Court rejected the claim on the ground that a functionality defense was established as a matter of law. We prefer to affirm on the alternate ground suggested by the District Court, *id.* at 122 n. 18, that Kregos has totally failed to create a triable issue of fact as to the existence of secondary meaning in the look or appearance of his form. *See Stormy Clime Ltd. v. Progroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987) (secondary meaning required for trade dress infringement claim).

 B. *False Copyright Notice.* The District Court also entertained Kregos' claim of a Lanham Act violation against Sports Features by reason of a copyright notice affixed to its form supplied to AP. Though the claim was not included in the complaint, Judge Goettel indicated in a supplemental oral ruling that he would have permitted an amendment to set forth the claim, but he rejected it on the ground that Kregos lacked an interest in his form protectable under the Lanham Act and for that reason could have no valid claim under the Act. This analysis, though not necessarily the ultimate conclusion, was incorrect. The fact that a proprietor fails to show sufficient secondary meaning in a mark to establish an infringement claim does not preclude his assertion of some other Lanham Act claim such as false designation of origin or false description. Kregos could complain, for example, if Sports Features unfairly competed with him by falsely claiming that its form was originated by some well-known baseball player.

 It is not clear from Kregos' papers in what respect he contends that the Sports

---

7. The District Court described the AP's 1986 form as "the same basic format as its earlier form with some modifications." 731 F.Supp. at 115. In a footnote, the Court referred to minor changes in headings as "cosmetic distinctions." *Id.* at 116 n. 8. As an example, the Court referred to the change in a column heading from "pitchers" to "probable pitchers." Though Kregos contends that the Court considered all of the changes from the AP's 1984 form to its 1986 form to be "cosmetic," Brief for Appellant at 10, we think Judge Goettel was careful to limit this

adjective to the inconsequential variations in headings, and was not undertaking to assess whether the substantive changes in the statistics selected for inclusion in the 1986 form would render it non-infringing as to Kregos' form, in the event that Kregos' copyright was valid.

8. At this stage of the case, we make no determination concerning the possible effect of the statute of limitations.

Features copyright notice is false. The notice makes no claim that the form originated from any source other than Sports Features. Nor does the notice contain any representation that is false, *cf. Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 37 (2d Cir.1982) (copyright notice falsely stating "Original" violates Lanham Act). If Kregos is simply saying that the notice is false in claiming creation by Sports Features in that the form is, under the copyright law, an infringement of Kregos' form, we reject his attempt to convert all copyright claims into Lanham Act violations. The Lanham Act claims were properly rejected.

### Conclusion

The judgment of the District Court is reversed and remanded with respect to the copyright claim, and affirmed with respect to the trademark claims.

SWEET, District Judge, concurring in part and dissenting in part:

While I concur in the majority's conclusion that Kregos has displayed sufficient creativity to satisfy the *Feist Publications* standard for copyrightability, I would affirm the district court's grant of summary judgment because I conclude that Kregos' idea here has merged into his expression.

### 1. Kregos' Idea

I agree with the majority that Kregos displayed at least some creativity in selecting his nine statistics for his pitching form, and thereby satisfied the creativity standards of *Feist Publications*. However, I believe that this selection was not simply an expression of the idea that this information might be of interest to sports fans, but instead represented his very specific idea that these nine statistics were the most significant ones to consider when attempting to predict the outcome of a baseball game. I respectfully disagree with the majority's statement that Kregos' idea was

the abstract "general idea that statistics can be used to assess pitching performance," [1] because while I agree that the application of the merger doctrine will always depend on the level at which the idea is formulated, I do not believe that the majority has set forth convincing grounds for its determination as to the idea at issue here.

If few people had previously considered using pitching statistics to handicap baseball games, I would agree that Kregos' particular selection of statistics might indeed be entitled to protection as a detailed expression of his idea. Here, however, the format and the arrangement of data existed prior to his choice of particular items to report, and thus his "creation" was nothing more than that choice, which as an expression seems to me inseparable from its idea.

I have difficulty distinguishing between Kregos' work and the example of a doctor's identification of the symptoms to use in diagnosing a disease, which the majority suggests would be unprotectible because of merger. In making this suggestion, the majority eschews the notion that the doctor's idea is the "general idea that the disease in question can be identified by observable symptoms" in favor of the more precise formulation that the idea is that "his selection of symptoms is a useful identifier of the disease." Majority Opinion at 707. This reasoning would appear to apply equally well to Kregos' case. In both cases, the creators have conceived very precise "ideas" concerning the significant data which ought to be considered in predicting a given result, and those ideas can be expressed only by identifying the relevant data. Of course, there is the obvious distinction that a system for making medical diagnoses is more socially beneficial than system for estimating sports odds, but such a distinction does not offer a basis for denying copyright protection to one while granting it to the other.[2]

---

1. While this statement may seem more consistent with Judge Goettel's statement that Kregos' idea was "to publish an outcome predictive pitching form," 731 F.Supp. at 119, I believe that Judge Goettel's analysis of the merger issue and

his finding that there was merger here indicate that he in fact considered Kregos' idea to be more specific than his initial statement suggests.

2. Nor is it appropriate to distinguish based on a claim that diagnosing a disease is more "scien-

The seminal articulation of the basic tension between idea and expression is found in *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879). Although the case is most often cited for its formulation of the "blank form" doctrine, in fact that issue was secondary to the decision. Selden had devised a new bookkeeping system and had written a book explaining its use and published ledger forms to be used when practicing the system. When the defendant published his own forms, slightly different from Selden's but similar enough that they could be used to practice Selden's system, Selden sued, claiming that Baker's forms had infringed his copyright in the book.

In denying relief, the Court relied primarily on the proposition that "[t]he use of the art is a totally different thing from a publication of the book explaining it." 101 U.S. at 104. In discussing this proposition, the Court commented

> The copyright of a work on mathematical science cannot give to the author an exclusive right to the methods of operation which he propounds, or to the diagrams which he employs to explain them, so as to prevent an engineer from using them whenever occasion requires. The very object of publishing a book on science or the useful arts is to communicate to the world the useful knowledge which it contains. But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book. *And where the art it teaches cannot be used without employing the methods and diagrams used to illustrate the book, or such as are similar to them, such methods and diagrams are to be considered as necessary incidents to the art, and given therewith to the public;* not given for the purpose of publication in other works explanatory of the art, but for the purposes of practical application.

*Id.* 101 U.S. at 103 (emphasis added). The Court therefore concluded that Selden's valid copyright in his book could not be extended to prevent others from using his system or the forms.

Only after it had reached this conclusion did the Court find it necessary to consider whether Selden's forms were themselves copyrightable. After reviewing several English authorities dealing with the limits of copyrightability, the Court concluded that "blank accountbooks are not the subject of copyright," and therefore dismissed Selden's claims. 101 U.S. at 107. It is this second holding, based on a rather abbreviated analysis, which has become known as the blank form doctrine. Due in large part to the limited explanation for this holding in *Baker,* the blank form doctrine has generated numerous questions and critiques, *see, e.g.,* 1 *Nimmer on Copyright* § 2.18[C] (1990), and not a few outright inconsistent decisions. *Compare Harcourt, Brace & World, Inc. v. Graphic Controls Corp.,* 329 F.Supp. 517 (S.D.N.Y.1971) *and Norton Printing Co. v. Augustana Hospital,* 155 U.S.P.Q. 133 (N.D.Ill.1967) *with Bibbero Systems, Inc. v. Colwell Systems, Inc.,* 893 F.2d 1104 (9th Cir.1990) *and John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966 (11th Cir.1983).

On the other hand, the *Baker* Court's initial holding, distinguishing between an "art" and an explanation of that art, has not been seriously challenged, and has steadily evolved and been refined into what is commonly referred to today as the idea/expression dichotomy, a concept which includes within its bounds the special case of merger. Of course, this doctrine has also generated extensive commentary and has produced its share of contradictory decisions, but in contrast to the blank form doctrine the major concern with respect to the idea/expression dichotomy has been how to apply it in any particular case, *i.e.,* how to select the appropriate level of abstraction, and not whether the doctrine is itself fundamentally sound.

Despite the numerous developments in this area since *Baker v. Selden* and the myriad complexities which have been graft-

tific" and less "creative" than handicapping a baseball game. No doubt many people, including both doctors and those who make their living, either legally or illegally, in the sports gambling profession, would dispute such a claim.

ed onto the basic doctrine, I see the present case as falling directly within the scope of *Baker*'s original discussion of the explanation/use distinction. In my opinion, Kregos' form constitutes an explanation of his preferred system of handicapping baseball games, and he seeks to use his copyright here to prevent others from practicing that system. This seems to present a clear example of a case where "the art [the work] teaches cannot be used without employing the methods and diagrams" which make it up. Of course, one difference between this case and *Baker* is that Kregos' copyright is not in a separate work explaining how to use the pitching form, but rather covers the form itself. However, the pertinent issue in *Baker* was not that Selden's book explaining the system was separable from the forms for using the system (in fact the forms were part of the book), but rather was that he sought to use his copyright in the book to prevent others from using the system. It was this use of the copyright which the *Baker* court condemned, and regardless of any intervening developments concerning the idea/expression issue, the reasoning remains as sound today as the day it was written.

Both on the summary judgment motion in the district court and on this appeal, Kregos has asserted that his form should not be held uncopyrightable as a blank form because it "convey[s] to his subscribers the categories of information which Kregos himself subjectively considers to be important for evaluating pitching performance." Appellants' Brief at 30; *see also* 731 F.Supp. at 120. Thus Kregos admits that his form incorporates an explanation of his outcome-predicting system and that

in distributing the form he intends to communicate that system to his customers. Once he has done voluntarily so, *Baker* prevents him from relying on the copyright to prevent others from using the system on their own.

The majority characterizes Kregos' work as dealing with "matters of taste and opinion," and therefore compares it to the list of baseball card prices in *Eckes v. Card Prices Update*, 736 F.2d 859 (2d Cir.1984) or to a listing of socially prominent families rather than to the hypothetical doctor's diagnostic chart. In my view, both the pitching form and the diagnostic chart are expressions intended to assist in predicting particular outcomes, with the data intended to be used as a basis for that prediction. In contrast, neither the card price list nor the social register is associated with any defined event or result, and the information reported—the card prices, the names of the families—is itself the primary feature or attraction.[3]

I find this situation closer to that in *Matthew Bender & Co. v. Kluwer Law Book Publishers, Inc.*, 672 F.Supp. 107 (S.D.N.Y.1987), in which the plaintiff sought protection only for its method of arranging information concerning personal injury awards. There, as here, there was no allegation that the defendant had copied the plaintiff's data, but merely that it had arranged its own data in a format which was similar to that used by the plaintiff. In denying relief to the plaintiff, Judge Conner held that the idea of the plaintiff's work was to provide useful information in a functional format, and that the copyright could not be used to preclude others from adopting that format. 672 F.Supp. at 110.[4]

---

3. I would also suggest that, to the extent that *Card Prices* turned on the plaintiffs' "selection, creativity and judgment" in selecting the 5,000 premium cards from the universe of 18,000 cards in all, *see* 736 F.2d at 863, the court appears to have overlooked the fact that the cards identified as "premium" were basically those with the highest market prices. Given that the market price data itself was within the public domain, it is not clear what creativity could have been involved in the mere identification of the high priced cards. In fact, the attention given to the amount of labor invested by the plaintiffs in developing their list, *see* 736

F.2d at 860, and the nature of the alleged infringement—copying the plaintiffs' premium list but using it to report updated price data—suggests that the decision was at least in some part based on the "sweat of the brow" test, notwithstanding the court's explicit recognition that "sweat of the brow" was an inappropriate measure of copyrightability. *Id.* at 862.

4. Judge Conner's comment that the plaintiff's categories were "the only sensible ones which could have been used to compile the data," 672 F.Supp. at 112, cited by the majority as grounds upon which to distinguish that case from the

In contrast, the issue in *Educational Testing Services v. Katzman*, 793 F.2d 533 (3d Cir.1986), was not whether the defendant could arrange its own original questions in the plaintiff's format, but whether it could copy the plaintiff's copyrighted questions for its own use. The court held that the proper level of abstraction for the ideas which underlay the plaintiff's questions was "the rules of punctuation, analogies, vocabulary," and concluded that "[o]ther persons, similarly resourceful, have ample latitude and opportunity to frame noninfringing questions testing the same subjects." 793 F.2d at 540. This conclusion at least implies that the plaintiff would not have been entitled to protect the categories or the distribution of its questions, but only the specific questions themselves.

Similarly, in *Toro Co. v. R & R Products Co.*, 787 F.2d 1208 (8th Cir.1986), the question was not whether the defendant could use the plaintiff's format for a parts numbering list, but whether it could copy the data contained in that format. Because there was no preexisting relationship between the parts and their numbers, the court held that there were many other possible "expressions" of the "idea" of a numbering system, and thus concluded that there was no merger. 787 F.2d at 1212.

While I agree with the majority's statement that "[e]very compiler of facts has the idea that his particular selection of facts is useful," I believe that there is a difference between the idea that a selection is useful and the more precise idea that it is the most useful selection possible.

The less precise idea is found in cases of compilations which are based on aesthetic choices, such as a list of socially-prominent families, or those in which the value of the compilation is due more to the fact of compilation than to the intrinsic value of the data being compiled: this would include the parts numbering list at issue in *Toro Co. v. R & R Products*, where the numbers were not significant prior to being associated

with the parts, the test questions in *Educational Testing Services*, where the questions were valuable to the defendants precisely because they had been used by the plaintiff, and, to the extent the selection was in fact subjective, the premium card list in *Card Prices*, where the defendants had no independent knowledge of which cards it would be profitable to update.

The more precise idea is found where the compiler's main purpose is to compile data which will allow a reader of the compilation to reach a clearly-defined goal, such as the case reports in *Matthew Bender*, where the goal was to estimate the possible settlement value of a case, or a doctor's diagnostic form, where the goal would be to diagnose the given disease, or Kregos' pitching form, where the goal is to predict the outcome of the game.

Finally, in light of the majority's agreement with the district court that Kregos' arrangement of the statistics was not itself creative or original, and therefore that his particular ordering is not protected, it is difficult to grasp exactly what "expression" the majority intends to protect, if not the fundamental expression that these nine items are valuable in predicting games. This difficulty becomes apparent as the majority speculates about the extent of protection to be given to Kregos' form.

*2. The Application of the Merger Doctrine*

As a secondary matter, I disagree with the majority's characterization of how the merger doctrine is applied in this Circuit. In *Durham Industries v. Tomy Corp.*, 630 F.2d 905 (2d Cir.1980), the court did not face the question of merger at all: in that case there were two dissimilar expressions which clearly shared only an underlying idea, and the court refused to extend the plaintiff's copyright on its expression to the idea, holding that there was no infringement of the expression, whether or not the defendant had copied the idea. The

---

present one, related not to the merger question but rather to the additional determination that the plaintiff's form did not demonstrate sufficient creativity to warrant a copyright. Thus

while *Bender* may be distinguishable, the distinction does not affect the applicability of Judge Conner's merger analysis to the present case.

only aspect of the case which touched upon the merger doctrine was the initial finding that there were two dissimilar expressions of the same idea, which implicitly rejected any claim that the idea and the expression had not merged.[5]

On the other hand, those cases which actually address the question of merger are those in which the copyrighted work and the allegedly infringing one appear at first glance to be similar or identical. *See, e.g., Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d 1458, 1463 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 374, 112 L.Ed.2d 336 (1990); *Toro Co. v. R & R Products Co.,* 787 F.2d 1208, 1212 (8th Cir.1986); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1253 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971); *Lotus Development Corp. v. Paperback Software International,* 740 F.Supp. 37, 61 (D.Mass.1990); *Matthew Bender & Co., supra,* 672 F.Supp. at 109; *Freedman v. Grolier Enterprises, Inc.,* 179 U.S.P.Q. 476, 478 (S.D.N.Y.1973). Only in such a situation does it make sense to inquire whether the apparent similarity is required by the use of the plaintiff's unprotectible expression, or whether there are enough alternative expressions of that idea that the plaintiff's choice deserves protection.

I believe the proper approach requires the court first to decide whether the copyrighted work satisfies the primary requirement of creativity, then to determine whether there is merger *before* extending copyright protection. This is based on the wording of § 102(b) of the Copyright Act, 17 U.S.C. § 102(b), which provides

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle,

or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

I interpret this language as indicating that protection cannot be given to a work which is inseparable from its underlying idea.

The Nimmer treatise supports the majority's approach, suggesting that merger must be considered in the context of determining whether infringement has occurred rather than in deciding the issue of copyrightability. Under this approach, a court which finds that merger exists should hold that the two works in question are not "substantially similar," even where they are in fact identical, a result which I view as a not useful variety of doublespeak.[6]

Nimmer notwithstanding, the majority of cases have rejected this approach and instead followed the method in which merger becomes an issue only when the two works in question—the copyrighted one and the alleged infringement—appear on the surface to be similar, and under which merger is used as a reason for denying all copyright protection to the plaintiff and thereby excusing the defendant's use of a similar or even identical expression. *See Kern River Gas Transmission Co. v. Coastal Corp.,* 899 F.2d 1458, 1463 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 374, 112 L.Ed.2d 336 (1990); *Toro Co.,* 787 F.2d at 1212; *Herbert Rosenthal Jewelry, supra,* 446 F.2d at 742; *Matthew Bender & Co.,* 672 F.Supp. at 109 (work which does not "exceed[ ] the boundaries of 'idea' and enter[ ] the realm of 'expression' " is not protectible); *Freedman v. Grolier Enterprises, supra,* 179 U.S.P.Q. at 478 ("When an idea is so restrictive that it necessarily requires a particular form of expression, that is, when the idea and its expression are functionally inseparable, to permit the copyrighting of the expression would be to

---

**5.** The question of merger is fundamentally disjunctive: if there are only a limited number of ways in which to express an idea, there is merger, otherwise there is not. There can be no "partial merger" of an idea and an expression of that idea. Thus the determination that numerous distinct expressions exist for a given idea is

equivalent to a determination that no merger has occurred.

**6.** Thus Nimmer places the discussion of merger under the heading of "Negating Substantial Similarity." *See* 3 *Nimmer on Copyright* § 13.03[B] at 13–48 (1990).

grant the copyright owner a monopoly of the idea").

The difference in applying these two approaches is not insignificant. Nimmer's method lends itself much more readily to the erroneous conclusion that merger is only available where the defendant has independently created an expression which happens coincidentally to be similar to the plaintiff's work. Merger is then viewed as a means of explaining the unintentional similarity between the two works—thus Nimmer's characterization of it as a means of negating substantial similarity. In other words, if a defendant has actually copied the plaintiff's work, it is unlikely to be allowed to rely on merger to avoid liability. *See, e.g., NEC Corp. v. Intel Corp.*, 1989 Copyright Law Decisions (CCH) ¶ 26,379 at p. 22,390, 1989 WL 67434 (N.D.Cal.1989) (defendant demonstrated independent "clean room" creation of software similar to plaintiff's to support its claim that similarities were required by external factors). This approach owes little if anything to the strictures of § 102(b), and instead depends on the fundamental principle of copyright law that independent creation is never infringement.[7]

The more common approach, in which merger is considered as part of the determination of copyrightability, absolves even a defendant who has directly copied the plaintiff's work if the idea of that work is merged into the expression. *See Kern River Gas, supra,* 899 F.2d at 1463; *Herbert Rosenthal Jewelry, supra,* 446 F.2d at 742 ("When the 'idea' and its 'expression' are thus inseparable, *copying the 'expression' will not be barred,* since protecting the 'expression' in such circumstances would confer a monopoly of the 'idea') (emphasis added; citations omitted). I believe this approach accords more fully with both the language and the purpose of § 102(b), and

serves to focus consideration on the proper definition of the idea at the outset of the inquiry.

As a final note, I have no quarrel with the majority's statement that "[a]ssessing merger in the context of alleged infringement will normally provide a more detailed and realistic basis for evaluating" a claim of merger: the analysis is greatly simplified by the example of the defendant's work and by the defendant's argument as to how the plaintiff's idea has merged with its expression. This does not alter my conclusion that the inquiry must involve the copyrightability of the plaintiff's work rather than the defendant's infringement.

Therefore, because I believe that the district court was correct in holding that Kregos' form is uncopyrightable because his idea has merged with his expression of that idea, I respectfully dissent.

---

**7.** In *NEC v. Intel,* this method of applying merger was justified on the grounds that "[t]he Register of Copyrights will not know about the presence or absence of constraints that limit ways to express an idea." 1989 Copyright Law Decisions at 22,381. This statement misunderstands the majority approach: the Register of Copyrights is not expected to determine whether to deny registration because of merger, as the

fact of registration offers no more than prima facie evidence of copyrightability. *E.g., Weissman v. Freeman,* 868 F.2d 1313, 1320 (2d Cir. 1989). Just as a plaintiff with a registered copyright may nevertheless be denied protection if the work lacks creativity, *e.g., Feist Publications, supra,* the presumption of validity arising out of registration may be overcome by proof to the court that the expression merges with the idea.