**TORAH SOFT LTD., Plaintiff,**

v.

**Michael DROSNIN, Simon & Schuster, Inc., Barnes & Noble, Inc., Borders, Inc., Ingram Book Group Inc., Baker & Taylor, Inc., and Bookazine Company, Inc., Defendants.**

**No. 00 Civ. 5650(SAS).**

United States District Court, S.D. New York.

March 30, 2001.

Howard I. Rhine, Andrea Fischer, Coleman, Rhine & Goodwin LLP, New York City, for Plaintiff.

Marcia B. Paul, Marni Beck Pedorella, William H. Crosby, Jr., Kay Collyer & Boose LLP, Kenneth David Burrows, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Torah Soft Ltd. ("Torah Soft") is suing Michael Drosnin, the author of *The Bible Code* (the "Book"), and the Book's publishers, distributors and retailers for copyright infringement caused by the unauthorized reproduction in the Book of printouts of output generated by plaintiff's computer program. Plaintiff asserts twelve. claims, the first of which is for copyright infringement in violation of 17 U.S.C. §§ 501 et seq.[1] The other eleven claims, brought

---

1. This is plaintiff's second lawsuit against defendants Drosnin and Simon & Shuster, Inc. ("S & S"). The first lawsuit was filed in New York State Supreme Court and removed to this Court on January 31, 2000. *See Torah Soft Ltd. v. Michael Drosnin*, 00 Civ. 0676 (S.D.N.Y. Jan. 31, 2000) (*"Torah Soft I"*). In that action, plaintiff alleges that Drosnin was

pursuant to 28 U.S.C. § 1367, allege copyright infringement under the laws of Canada, Mexico, the United Kingdom, Germany, France, Italy, Korea, Japan, Russia, South Africa, and other countries "too numerous to specify." Amended Complaint ("Am.Compl.") ¶¶ 13, 81–111. Defendants now move to dismiss the Amended Complaint or for Summary Judgment, pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(c) and/or 56. Defendants also move to dismiss the copyright infringement claims pleaded under foreign law under the doctrine of *forum non conveniens*. For the reasons stated below, defendants' motions are granted.

## I. LEGAL STANDARD

When matters outside the pleadings are presented to a district court, the court should convert a motion to dismiss to a summary judgment motion and afford all parties the opportunity to present supporting material. *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000). This conversion requirement is strictly enforced whenever there is a "legitimate possibility" that the district court will rely on material outside the complaint. *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir.1999). Because both plaintiff and defendants have submitted material outside the pleadings on which the Court relies, this motion is treated as one for summary judgment.[2] Rule 56 provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law[,] [while] [a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quotation marks and citations omitted).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, No. 00 126, 2001 WL 8559, at *3 (2d Cir. Jan. 4, 2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir.1999); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely col-

---

obliged to include credit and contact information regarding Torah Soft in the Book, and asserts claims for breach of contract, unjust enrichment, and quantum meruit. *Torah Soft I* is currently pending before Magistrate Judge James C. Francis IV.

2. The parties are not entitled to present additional supporting material. Both plaintiff and defendants have already submitted statements of material facts pursuant to Local Rule 56.1.

Moreover, defendants moved for summary judgment in the alternative, and plaintiff's memorandum of law responded as if defendants moved only for summary judgment. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and For Summary Judgment ("Pl.Opp.") at 12–13 (providing the legal standard only for a summary judgment motion).

orable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations and alterations omitted).

## II. BACKGROUND

### A. The Bible Code

The Book is a non-fiction account of Drosnin's introduction to and adventure with the "Bible code". *See* Statement of Material Facts by Defendants Pursuant to Local Rule 56.1 ("Def.56.1") ¶ 3. Drosnin— a reporter formerly with *The Washington Post* and *The Wall Street Journal*—was introduced to the Bible code while meeting with the Israeli mathematician Dr. Eliyahu Rips in 1992. *See* Affidavit of Michael Drosnin ("Drosnin Aff.") ¶¶ 3, 5.

According to Bible code scholars, the Hebrew Bible[3] is embedded with a code which appears to foretell future events. *See* Def. 56.1 ¶ 9. This code is revealed by finding words and phrases which appear in the Bible at equidistant letter skips ("ELS's"). *See* Statement of Material Facts by Plaintiff Pursuant to Local Rule 56.1 ("Pl.56.1") ¶ 8. These ELS's are most efficiently found by using a computer program to search the Hebrew letters of the text of the Bible.[4] *See* Pl. 56.1 ¶ 10. Some Bible code computer programs will then rearrange the letters of the Bible and display the output in stacks of rows, each row the length of the ELS's "skip" sequence. *Id.* ¶ 11. Stacking the rows on top of one another creates a matrix. *See id.* The code is revealed in words or phrases that transect the searched word or appear in

statistically close proximity to it in the matrix. *See id.* ¶ 12.

For example, as explained in the Book, the Hebrew letters forming the name "Yitzhak Rabin" are found consecutively only once in the Bible, with 4,772 letters separating each letter of his name. *See* Michael Drosnin, *The Bible Code*, at 27. The skip sequence is thus 4,772. *See id.* The code reveals itself with the discovery that intersecting the name "Yitzhak Rabin" is the Hebrew phrase "assassin will assassinate." *See id.* at 28; .

### B. The Torah Soft Software and Database

Until the early or mid–1990's, researchers in the field of Bible code research consisted primarily of Orthodox Jews. *See* 12/4/00 Declaration of Yochanan Spielberg ("Spielberg Decl."), principal shareholder and sole officer of Torah Soft, ¶ 22. In addition, prior to 1988, there was no commercially available computer software for searching the Bible code. *See id.* This is due, in part, to the fact that no Bible code program complied with the Jewish doctrine of *sheimot*, which prohibits forming the letters that constitute certain of the several Hebrew names of God in a medium that is expected to be deleted.[5] *See* Pl. 56.1 ¶ 22.

In the late 1980's, Yochanan Spielberg, an ordained Rabbi with a Ph.D. in physics, placed the Torah on a database (the "Database") without violating the *sheimot* rules. *See* Spielberg Decl. ¶ 5. Spielberg took an electronic version of the Torah and substi-

---

**3.** The Hebrew Bible is divided into three parts. The first division consists of the five books of the Torah, also referred to as the Pentateuch. The second and third divisions consist of the Prophets and the Writings.

**4.** The Torah alone contains 304,805 Hebrew letters. *See* Pl. 56 .1 ¶ 10.

**5.** The Hebrew names for God include "Lord", "Almighty", "God" (as ruler), "God" (as in the first verse of the Book of Genesis), "Lord of Hosts", and the sayings "I am that I am" and "the King who is the King of Kings." *See* List of Spielberg's Changes, Ex. A to Am. Compl.

tuted a different non-Hebrew symbol—such as a hyphen (-), pound (#), asterisk (*), or exclamation point (!)—for a particular letter in one of the several Hebrew names for God. *See* Pl. 56.1 ¶ 24. This departed from the traditional method of complying with the *sheimot* rules, which is to insert a hyphen between the letters. *See id.* ¶ 40.

Spielberg eventually added the texts of the Prophets and the Writings to the Database. *See* Spielberg Decl. ¶ 29. However, because "there are *hundreds* of cases of disagreement as to the[ir] authentic text," *id.* ¶ 31, Spielberg had to determine which is the authentic text of the Prophets and the Writings. *See* Pl. 56.1 ¶ 50. As a result, there is no version of the Prophets and the Writings that is wholly identical to plaintiff's version. *See* Spielberg Decl. ¶ 32. Spielberg also made his *sheimot* substitutions to the text of the Prophets and the Writings. *See id.* ¶ 30. Finally, Spielberg replaced final consonants in the Bible with non-final consonants.[6] *See id.* ¶ 26.

Spielberg also wrote a computer program (the "Software"), designed to be used with the Database, which permits Bible code research that does not violate the *sheimot* rules. *See* Spielberg Decl. ¶ 5; Pl. 56.1 ¶ 41. The Software executes a unique algorithm which displays ELS finds by searching for the least common letter of the search term. *See* Spielberg Decl. ¶ 52. In searching the Database, the Software treats the non-Hebrew characters as the Hebrew letters for which they substitute, thus preserving the accuracy of Bible code finds. *See id.* ¶ 27. The Software then displays the ELS's in a two-dimensional matrix format similar to a crossword puzzle. *See* Pl. 56.1 ¶ 33. In addition, the Software does not count the spaces between the words of the Biblical text and removes the spaces when displaying a Bible code matrix. *See* Spielberg Decl. ¶ 26; Pl. 56.1 ¶ 10.

Drosnin bought a copy of the Software in the summer of 1992.[7] *See* Spielberg Decl. ¶ 33. That year, Drosnin and Torah Soft allegedly entered into a contract whereby Torah Soft agreed to provide Drosnin with one or more modified versions of its Software. *See* Pl. 56.1 ¶ 16. In exchange, Drosnin allegedly agreed to credit Torah Soft in the Book and include Torah Soft's contact information. *See id.* Drosnin did neither. *See* Complaint in *Torah Soft I* ¶ 3. Moreover, without plaintiff's consent, Drosnin included in the Book approximately 100 printouts ("Printouts") of the Software's output of matrixes of Bible code finds. *See* Pl. 56.1 ¶ 18.

The Book was published in English by S & S in May 1997, and became a national best-seller. *See* Def. 56.1 ¶ 4. The Book was also published and distributed in over twenty-five other languages. *See id.* ¶ 5. Plaintiff alleges that the Book could not have been published—or, alternatively, could not have become a best-seller—were it not for the inclusion of these printouts. *See* Pl. 56.1 ¶ 3.

Plaintiff filed this action on July 28, 2000. The only federal claim asserted is for copyright infringement in violation of 17 U.S.C. §§ 501 et seq. *See* Am. Compl. ¶¶ 66–79. Plaintiff maintains that the Software and the Database are original works of authorship within the meaning of

---

6. The Hebrew alphabet is composed of twenty-two letters. Of those, five letters are written differently when they appear at the end of a word than when they appear in the beginning or middle of the word.

7. Every copy of the Software that Torah Soft sold, including the Software purchased by Drosnin, contained notice that it is protected by copyright. *See* Pl. 56.1 ¶¶ 38, 55.

17 U.S.C. § 102 and that only Spielberg or plaintiff had the right to reproduce, in whole or in part, the Software and the Database. *See id.* ¶¶ 66, 67, 70.

## III. DISCUSSION

It is critical to understand what this case is not about. Plaintiff does not claim to have discovered the Bible code, invented the concept of ELS's, or even created the original Bible code software. Plaintiff does not claim that it is the author of Drosnin's specific Bible code finds. Nor does plaintiff accuse defendants of creating an infringing Bible code software or database. Rather, plaintiff claims that defendants' reproduction of the Printouts constitutes copyright infringement.

In a suit for copyright infringement, a plaintiff must establish that: (1) it owns a valid copyright; and (2) the defendants copied constituent elements of the work that are original. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 674, 679 (2d Cir.1998), *cert. denied sub nom. West Publ'g Co. v. HyperLaw, Inc.*, 526 U.S. 1154, 119 S.Ct. 2039, 143 L.Ed.2d 1048 (1999). With respect to the second prong, not all copying is actionable. A plaintiff must demonstrate that the allegedly infringing material bears a substantial similarity to copyrightable elements of plaintiff's work. *See Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir.1992).

■ Defendants are entitled to summary judgment if they can show that "at least one requisite element of the claim cannot be proven." *Cantor v. NYP Holdings, Inc.*, 51 F.Supp.2d 309, 311 (S.D.N.Y. 1999). Although the question of substantial similarity often raises questions of fact not appropriately resolved on a motion for summary judgment, noninfringement may

be decided as a matter of law "either when the similarity concerns only noncopyrightable elements of plaintiff's work, or when no reasonable trier of fact could find the works substantially similar." *O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.*, No. 96 Civ. 7952, 1999 WL 47191, at *5 (S.D.N.Y. Feb. 2, 1999) (quotation marks, citation, and alteration omitted).

■ Defendants do not contest plaintiff's ownership of a valid copyright. Rather, defendants argue that: (1) the Printouts are not substantially similar to the Software or the Database; and (2) any similarity concerns only non-protectable elements of the Software and Database. In addition, defendants contend that the Printouts are a fair use of the Software and Database.

### A. Substantial Similarity

Defendants assert that the Printouts are not substantially similar to any arguably protectable expression in the Software and the Database because "although the Printouts are 'created' by the Software, they do not exist in it or appear, as matri[x]es, in the Database. Stated otherwise, the Printouts do not exist in either the Software or the Database, because they are not *fixed* in either." Defendants' Memorandum of Law in Support of Motion to Dismiss and/or For Summary Judgment ("Def.Mem.") at 14 (emphasis in original). In short, defendants argue that Drosnin, rather than plaintiff, is the author of the Printouts because he inputted the particular queries from which the Software created the matrixes. *See id.* at 14 n. 20 ("*Drosnin* fixed the Printouts on his computer screen by formulating and initiating the search.").

Section 102 of the 1976 Copyright Act provides in relevant part:

(a) Copyright protection subsists ... in original works of authorship *fixed in any tangible medium of expression,* now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 102 (emphasis added). A work, in turn, is "fixed" when "its embodiment in a copy ... is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. In the context of video games, the Second Circuit has held that "all portions of the program, once stored in memory devices anywhere in the game, are fixed in a tangible medium within the meaning of the Act." *Stern Elecs., Inc. v. Kaufman,* 669 F.2d 852, 856 n. 4 (2d Cir.1982). In that case, the court squarely rejected an argument similar to the one advanced by the defendants here:

> [T]he player's participation does not withdraw the audiovisual work from copyright eligibility. No doubt the entire sequence of all the sights and sounds of the game are different each time the game is played.... Nevertheless, many aspects of the sights and the sequence of their appearance remain constant during each play of the game.... It is true ... that some of these sights and sounds will not be seen and heard during each play of the game.... But the images remain fixed ... [and][t]he repetitive sequence of a substantial portion of the sights and sounds of the game qualifies for copyright protection as an audiovisual work.

*Id.* at 856; *see also Williams Elecs., Inc. v. Artic Int'l, Inc.,* 685 F.2d 870, 874 (3d Cir.1982) (rejecting same argument).

Here, Spielberg created the Software which, in response to an end-user's input of a particular term, sifts through the Database, reorganizes it according to its algorithm, and then creates a matrix that displays that search term. Although the matrixes do not appear either in the Software or the Database, they are "fixed" insofar as the output is repeatable whenever the input is identical. That is to say, each time an end-user inputs the phrase "Yitzhak Rabin," the Software will produce the same matrix. *See* Drosnin Aff. ¶ 8 (stating that Bible code finds that Drosnin made utilizing another Bible code computer program could be replicated using plaintiff's Software). This "repetitive sequence" fixes the matrixes in the Software and the Database.

In addition, an end-user's role in creating a matrix is marginal. Creating a matrix is unlike the creative process used in many computer art programs, which permit an end-user to create an original work of art in an electronic medium. It is fair to say that users of such programs often supply the lion's share of the creativity to create the screen display. By contrast, an end-user of the Software merely inputs a word or phrase which the Software searches for in the Database. Thus, the Software does the lion's share of the work. Indeed, Drosnin's inputs, generally consisting of no more than a single word or phrase, would fail to meet the minimum threshold of originality. *See infra* Part III.B.2. In short, Drosnin is not the author of the matrixes.

Defendants do not contest that the Printouts are reproductions of the matrixes. In effect, defendants concede that they copied constituent elements of plaintiff's work. This is not, however, the end of the inquiry. The central question is whether the matrixes contain protectable expression. *See Arica Inst.,* 970 F.2d at 1072. Because the matrixes are generated by the Software's search of the Database, whether they are protectable turns on

whether the Software and the Database contain protectable elements.

## B. Protectable Elements of a Computer Program

It is well-established that computer programs are protected by copyright law as literary works. *See Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 702 (2d Cir.1992). And like literary works, computer programs contain both "literal" and "non-literal" elements. Literal elements consist of the computer program's "source" and "object" codes,[8] while non-literal elements may generally be described as the "structure, sequence, and organization" of the underlying program. *O.P. Solutions*, 1999 WL 47191, at *6. Such non-literal elements include the program architecture, screen displays, and computer-user interface. The Second Circuit has held that these non-literal elements are also copyrightable. *See Altai*, 982 F.2d at 702.

"[A]s one moves from the literal code to more general levels of a program, it becomes more difficult to distinguish between unprotectible ideas, processes, methods or functions, on one hand, and copyrightable expression on the other." *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1341 (5th Cir.1994). The Second Circuit, therefore, employs a three-step analysis of "abstraction-filtration-comparison" to weed out the unprotectable elements of a computer program and determine substantial similarity. *Altai*, 982 F.2d at 706. Under this analysis, a court must first abstract the program, breaking it into its structural parts at varying levels of abstraction. *See id.* Next, the court filters out those elements that are not protectable. *See id.* Finally, the court compares the remaining protectable elements of the plaintiff's program to the defendants' work to determine if substantial similarity exists. *See id.*

### 1. Abstraction

The abstraction process is a method of theoretically dissecting the plaintiff's program into its constituent structural parts. Here, however, plaintiff has already presented the Court with a list of features that it believes are protectable, *see infra* Part III.C, thus eliminating the need for any further abstraction. *See Mitek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1555 (11th Cir.1996) ("[I]f the copyright holder presents the court with a list of features that it believes to be protectable . . ., the court need not abstract further such features.").

### 2. Filtration

The filtration step merely "appl[ies] well developed doctrines of copyright law" in an attempt to "leave behind a 'core of protectable material.'" *Altai*, 982 F.2d at 707 (citation omitted). The filters through which the material must pass include the constitutional and statutory requirement of originality, the Copyright Act's distinction between expression and ideas or processes, the doctrines of "merger" and "scènes à faire," and the public domain exception. Each is discussed in turn below.

### a. Originality

"The *sine qua non* of copyright is originality." *Feist*, 499 U.S. at 345, 111 S.Ct. 1282. As used in copyright, the term original means only that the work was independently created by the author rather than copied from other works, and that it

---

8. Source code is the human readable instructions typed in by the programmer, while object code is the machine readable instructions that dictate how a computer behaves, and consists exclusively of a series of zeros and ones. *See Altai*, 982 F.2d at 698.

possesses a modicum of creativity. *See Matthew Bender,* 158 F.3d at 681. "Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying." *Feist,* 499 U.S. at 345, 111 S.Ct. 1282. Although the standard of originality is low, it is not without effect. A work must possess more than a *de minimis* quantum of creativity. *See Feist,* 499 U.S. at 362, 111 S.Ct. 1282 ("[T]he selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever. The standard for originality is low, but it does exist. . . . [A]n author who claims infringement must prove the existence of . . . intellectual production, of thought, and conception.") (quotation marks and citations omitted).

#### b. Functional Elements

In addition, the Copyright Act distinguishes ideas and functional items, neither of which is protected, from creative and expressive works, which are protected:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b).

#### c. Merger

The Second Circuit has explained the "merger" doctrine, first articulated in *Baker v. Selden,* 101 U.S. 99, 11 Otto 99, 25 L.Ed. 841 (1879), as follows:

> The fundamental copyright principle that only the expression of an idea and not the idea itself is protectable has produced a corollary maxim that even expression is not protected in those instances where there is only one or so

few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself. *Hart v. Dan Chase Taxidermy Supply Co.,* 86 F.3d 320, 322 (2d Cir.1996) (quotation marks omitted). This doctrine is particularly relevant when dealing with computer programs because "efficiency concerns may so narrow the practical range of choice as to make only one or two forms of expression workable options." *Altai,* 982 F.2d at 708; *see also* 4 Melville B. Nimmer, *Nimmer on Copyright,* § 13.03[F][2], at 12–129 (1998) ("Although, theoretically, many ways may exist to implement a particular idea, efficiency concerns can make one or two choices so compelling as to virtually eliminate any other form of expression.").

#### d. Scènes à Faire

 Nor can copyright protection be afforded to "scènes à faire"—expressions that are "as a practical matter, indispensable or at least standard in the treatment of a given [idea]." *Data East USA, Inc. v. Epyx, Inc.,* 862 F.2d 204, 208 (9th Cir. 1988) (quotation marks omitted). A computer programmer's freedom of design is often circumscribed by extrinsic considerations such as (1) the mechanical specifications of the computer; (2) compatibility requirements with other programs; (3) computer manufacturers' design standards; (4) demands of the industry being serviced; and (5) widely accepted programming practices within the computer industry. *See Altai,* 982 F.2d at 709–10. "Perhaps the most significant external factors influencing program design are the business practices and technical requirements of the end user." 4 Nimmer § 13.03[F][3][d], at 13–136.

#### e. Public Domain

Finally, related to the scènes à faire doctrine is the principle that expressive

elements taken from the public domain are not protectable. *See Altai*, 982 F.2d at 710 ("[M]aterial found in the public domain ... is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work."); *O.P. Solutions*, 1999 WL 47191, at *9. As the *Altai* court noted, there is "no reason to make an exception to this rule for elements of a computer program that have entered the public domain." *Altai*, 982 F.2d at 710.

### 3. Comparison

In the final step, a court is to compare the protected elements—or "golden nugget"—of the plaintiff's computer program with the allegedly infringing work. *See id.* A court should focus on "whether the defendant[s] copied any aspect of this protected expression, as well as an assessment of the copied portion's relative importance with respect to the plaintiff's overall program." *Id.*

### C. Applying the *Altai* Analysis

### 1. The Database

Plaintiff wisely admits that the Hebrew Bible, which is the backbone of the Database, is in the public domain and thus unprotectable. *See* Pl. 56.1 ¶ 25. Nevertheless, plaintiff contends that the changes Spielberg made to the Hebrew Bible— changes which appear in the matrixes— warrant protection for the Database as a compilation.[9] *See* Pl. Opp. at 18. Specifically, plaintiff maintains that the Database is protectable as a compilation because "the Database represents Spielberg's expression of (a) his understanding of the application of the *sheimot* rules to an electronic form of the entire Hebrew Bible[,] and (b) his understanding of the most au-

thentic version of the Prophets and the Writings." *See* Pl. Opp. at 18. In addition, although not discussed in its memorandum of law, plaintiff suggests that Spielberg's act of replacing final consonants of Hebrew letters by non-final consonants demonstrates the requisite degree of originality. *See* Spielberg Decl. ¶ 26.

■ A work comprised of material which in itself is not protected may become protectable as a compilation if the copyright holder has utilized sufficient creativity in selecting and arranging the material. *See Feist*, 499 U.S. at 358, 111 S.Ct. 1282 (compiling facts in an area-wide telephone directory does not meet the constitutional requirement of originality); *Matthew Bender*, 158 F.3d at 681, 683–86 (holding that enhancements made by publisher of judicial opinions—such as shortening the form of titles, inserting parallel citations, providing subsequent case history, and providing information concerning counsel—are not copyrightable because they miss the creative spark). "All that is needed for a finding of sufficient originality is a 'distinguishable variation' that is not merely trivial, even if the copyrighted work is based on prior copyrighted or public domain works." *Re–Alco Indus., Inc. v. National Ctr. for Health Educ., Inc.*, 812 F.Supp. 387, 393 (S.D.N.Y.1993) (citation omitted); *see also Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102–103 (2d Cir.1951) ("[A] copy of something in the public domain will support a copyright if it is a distinguishable variation.") (quotation marks omitted). Originality in selection and arrangement "is a function of (i) the total number of options available; (ii) external factors that limit the viability of certain options and render others non-

---

9. The Copyright Act defines a compilation as the "collection and assembling of preexisting materials or of data that are selected, coordi-

nated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.

creative; and (iii) prior uses that render certain selections 'garden variety.'" *Matthew Bender*, 158 F.3d at 682–83.

### a. The *Sheimot* Changes

█ Spielberg's *sheimot* changes are functional in nature. As plaintiff admits, Spielberg departed from the traditional method of complying with the *sheimot* rules for functional reasons:

> One of the reasons that Spielberg designed the Database the way that he did was to ensure that the steps taken to comply with the *sheimot* rules would not adversely affect the *number* of characters in the Database. If he had *inserted* a hyphen (or any symbol), then the total number of characters in the text would have been *increased* by a number equal to the total number of occurrences of the name of God. The technique of using specific *substitutions*—instead of insertions—was the method that Spielberg used to integrate the Database with the Software in order to comply with the *sheimot* rules *and* enable the user to search for ELS's.

Pl. Opp. at 10 (emphasis in original). As a functional, as opposed to a creative, alteration, the *sheimot* changes are not protectable. *See Productivity Software Int'l, Inc. v. Healthcare Techs. Inc.*, No. 93 Civ. 6949, 1995 WL 437526, at *5 (S.D.N.Y. July 25, 1995) (denying protection to plaintiff's design of input boxes because they were dictated by functionality).

Moreover, plaintiff admits that his compliance with the *sheimot* rules was required by the end-users to which he was marketing the Software—namely, Orthodox Jews. *See* Spielberg Decl. ¶ 22. His changes, therefore, are merely scenes a

faire. *See Plains Cotton Co-op. v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256, 1262 (5th Cir.1987) (affirming denial of preliminary injunction against alleged program infringer because, in part, "many of the similarities between the ... programs [were] dictated by the externalities of the cotton market.").

Plaintiff argues that Spielberg's *sheimot* substitutions are original because he "had numerous options from which to chose [sic] in making the *sheimot* substitutions ... but he chose his set of four symbols because he thought that they would be distinctive." Pl. Opp. at 20. Plaintiff has failed to demonstrate how an asterisk or a pound symbol is any more distinctive than a plus sign or an ampersand. Spielberg's choice of symbols are "obvious, garden-variety, or routine selections." *Matthew Bender*, 158 F.3d at 681. Not only are the symbols in themselves unprotectable,[10] but the decision to use these particular symbols in the Database is nothing more than a *de minimis* quantum of creativity. *See Matthew Bender*, 158 F.3d at 685–86 ("'Even where theoretically there is a large number of items to choose from, functional, commercial, or legal constraints may limit, or even bar, protectability.'") (quoting 1 William F. Patry, *Copyright Law and Practice* 196–97 (1994)); *Toro Co. v. R & R Prods. Co.*, 787 F.2d 1208, 1212 (8th Cir.1986) ("[Plaintiff's] parts numbering 'system' falls short of even the low threshold of originality [because] [t]he random and arbitrary use of numbers in the public domain does not evince enough originality to distinguish authorship."); *Grove Press, Inc. v. Collectors Publ'n, Inc.*, 264 F.Supp. 603, 605 (C.D.Cal.1967) (40,-000 changes consisting "almost entirely of elimination and addition of punctuation,

---

**10.** *See* 37 C.F.R. § 202.1 (denying registration to "[w]ords and short phrases such as names, titles, and slogans; *familiar symbols* and designs; mere variations of typographic orna-

mentation, lettering or coloring; mere listing of ingredients or contents.") (emphasis added).

changes of spelling of certain words, elimination and addition of quotation marks and correction of typographical errors" held trivial, and thus, not protectable); *cf. Brief English Sys. v. Owen*, 48 F.2d 555, 556 (2d Cir.1931) ("There is no literary merit in a mere system of condensing written words into less than the number of letters usually used to spell them out."). To extend protectability to compilations that consist of "minuscule variations would simply put a weapon for harassment in the hands of mischievous copiers intent on appropriating and monopolizing public domain work." *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 492 (2d Cir.1976).

### b. Adding Authentic Versions of the Prophets and the Writings

■ Spielberg's selection of which version of the Prophets and the Writings to include in the Database does not contribute to its protectability as a compilation. The Hebrew Bible necessarily consists of a compilation of the Torah, the Prophets, and the Writings arranged in precisely the same order as arranged in the Database. Plaintiff has not claimed that all of the text of the Prophets and the Writings is subject to debate, but only limited portions. Not only has plaintiff failed to identify precisely how Spielberg altered the text of the Prophets and the Writings, but Spielberg's selection and arrangement of the Hebrew Bible is nothing more than a trivial distinguishable variation.[11] *See Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*, 945 F.2d 509, 514 (2d Cir.1991) (holding that a compilation copyright is not so

"thin" as to be "anorexic," and does not allow "subsequent compilers to avoid infringement suits simply by adding a single fact to a verbatim copy of the copyrighted compilation, or omitting in the copy a single fact contained in the copyrighted compilation.").

Implicitly conceding as much, plaintiff argues that Spielberg's choice should be protected because of the time and effort expended deciding which texts are authentic. *See* Pl. Opp. at 9 ("In order to arrive at an understanding of what is the authentic text of the Prophets and the Writings, and in order to arrive at a determination as to what *sheimot* changes to make, Spielberg consulted and carefully studied dozens of sources of Jewish law. In addition, he consulted with at least a dozen scholars of Jewish law . . . ."). However, it is clearly established that such "sweat of the brow" does not confer copyright protection. *See Feist*, 499 U.S. at 354, 111 S.Ct. 1282 (holding that substantial effort and expense alone do not render compilation protectable); *Altai*, 982 F.2d at 711 ("[S]ubstantial effort alone cannot confer copyright status on an otherwise uncopyrightable work . . . . [D]espite the fact that significant labor and expense often goes into computer program flow-charting and debugging, that process does not always result in inherently protectable expression.").

### c. Replacing Final Consonants with Non-Final Consonants

■ Plaintiff further contends that the Database is original because Spielberg re-

---

11. Plaintiff has not cited a single case in which an author was granted a protectable copyright for his reproduction of an ancient public domain work such as the Bible. The Supreme Court of Israel, however, recently granted a scholar a copyright over the Dead Sea Scrolls. *See generally* Mary Curtius, *Sea Scrolls Scholar Wins Copyright Case*, L.A. Times, Aug. 31, 2000, at A4. In that case, the author spent years piecing together the ancient scrolls and restoring large portions which were missing. This process demonstrated a great deal of imagination and originality, and stands in stark contrast to Spielberg's alterations here. *See* C.A. 2790/93, 2811/93, *Shanks et al. v. Oimron* (decided August 30, 2000).

placed final consonants of Hebrew letters with non-final consonants. However, Spielberg's mechanical substitution of two forms of the same Hebrew letter "required no skill beyond that of a high school ... student and displayed no originality." *Grove Press,* 264 F.Supp. at 605; *see also Matthew Bender,* 158 F.3d at 689 (stating that compilation is sufficiently creative where "the compiler select[s] from among numerous choices, exercising subjective judgments relating to taste and value that were not obvious and that were not dictated by industry convention."); *Productivity Software Int'l,* 1995 WL 437526, at *4–5 (denying protectability to several of plaintiff's computer software designs because considerations of utility dictated only two options).

Taken as a whole, Spielberg's changes to the Bible do not transform the text of the Bible—a work clearly in the public domain—into an original compilation. Spielberg's alterations are nothing more than non-original changes dictated by the technological requirements of Bible code software and the end-user market, and thus, are not protectable.

**2. The Software**

Plaintiff maintains that the Software is protectable because: (1) it displays Bible code finds in a matrix format; (2) it displays multiple Bible code finds on one screen display; (3) unlike other Bible code programs' source code, the algorithm used in the Software searches for the least common letter of the search term; and (4) it removes the spaces between words in searching for and displaying Bible code finds. *See* Spielberg Decl. ¶¶ 26, 42, 45–49, 52. When closely examined, none of these features are protectable.

**a. The Matrix Format**

■ Plaintiff contends that Bible code finds need not be displayed in a matrix format. *See* Pl. 56.1 ¶¶ 12, 47. Indeed, in 1992, when Drosnin obtained a copy of the Software, it was "the only commercially available computer program that displayed the Biblical text in a matrix format." Pl. 56.1 ¶ 45. Plaintiff maintains that Spielberg's decision to display Bible code finds in a matrix format demonstrates a sufficient degree of originality. *See* Pl. Opp. at 20.

However, Spielberg did not originate the idea of displaying Bible code finds in a matrix format.[12] *See* Pl. 56.1 ¶ 22 ("Plaintiff did not originate the idea of a matrix format for displaying Biblical text."); Transcript of Deposition of Dr. Eliyahu Rips, Ex. A to 1/12/01 Supplemental Affidavit of Michael Drosnin ("Drosnin Supp. Aff.") at 45 (stating that the software used by Dr. Rips before 1992 displayed Bible code finds in matrix format); Complaint in *Torah Soft I* ¶ 14 ("Since the 1980's, advances in computer technology have enabled ... researchers to use computers to search the Bible code. Such technology has enabled, inter alia, the Biblical text to be displayed in a matrix format (as opposed to a linear format)."). Because the matrix format was not independently created by Spielberg, it cannot contribute to the Software's originality. *See Feist,* 499 U.S. at 345, 111 S.Ct. 1282 ("Original ... means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.").

Even if Spielberg had originated the idea of displaying Bible code finds in a

---

**12.** Indeed, plaintiff's statement that in 1992, the Software was the only "commercially available" program that displayed finds in a matrix format underscores the fact that the concept of a matrix display was not Spielberg's original creation.

matrix format, such "expression" is not protectable. Bible code finds can be displayed only in a limited number of ways. Plaintiff presents only two competing means of displaying Bible code finds—in a linear or matrix format. Indeed, other Bible code computer programs display finds in the same matrix format. *See* Pl. 56.1 ¶ 11. As such, the matrix format is a commonplace or stock feature of Bible code computer software and is not protectable.[13] *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1473 (9th Cir. 1992) (affirming district court's finding that "[p]laintiffs may not claim copyright protection of an ... expression that is, if not standard, then commonplace in the computer software industry.") (quotation marks and citation omitted); *Productivity Software Int'l*, 1995 WL 437526, at *5 (holding that use of separate edit screen is not protectable because "numerous computer programs utilize one screen configuration to display data, and another screen configuration to input and edit data"); *Apple Computer v. Microsoft Corp.*, 799 F.Supp. 1006, 1028 (N.D.Cal.1992) (holding that Apple's desktop interface has become a standard industry feature and can therefore be copied).

### b. Displaying Multiple Bible Code Finds

■ The Software's ability to display multiple Bible code finds in a single matrix is not a protectable element. The expression of displaying multiple finds in a single matrix merges with the idea of the Bible code, which ascribes particular significance to finds that intersect one another. To grant protection to plaintiff for devising a formula capable of displaying Bible code finds in such a manner would grant plaintiff a monopoly over the unprotectable idea of a Bible code.[14] *See Baker*, 101 U.S. at 103, 11 Otto 99 ("The copyright of a work on mathematical science cannot give to the author an exclusive right to the methods of operation which he propounds, or to the diagrams which he employs to explain them, so as to prevent an engineer from using them whenever occasion requires.").

Plaintiff argues that the merger doctrine should not be applied here because defendants have actually copied plaintiff's work. *See* Pl. Opp. at 13 n. 5. The Second Circuit has stated that " 'if a defendant has actually copied the plaintiff's work, it is unlikely to be allowed to rely on merger to avoid liability.' " *Matthew Bender*, 158 F.3d at 688 (quoting *Kregos v. Associated Press*, 937 F.2d 700, 716 (2d Cir.1991) (Sweet, J., concurring in part and dissenting in part)). However, not all copying bars application of the merger doctrine. Otherwise, the merger doctrine would stand for nothing more than the fundamental principle that independent creation is never infringement. *See Kregos*, 937 F.2d at 716. The Second Circuit has distinguished between "wholesale copying *of* a compilation [and] some more limited copying *from* a compilation." *CCC Info. Servs., Inc. v. Maclean*

---

**13.** Plaintiff has submitted four articles about the Bible code showing finds not displayed in a matrix format. *See* Exs. 2–5 of Spielberg Decl. But, each of these Bible code finds is displayed in the standard Hebrew text of the Bible, not in a computer printout. Spielberg has not presented any evidence countering defendants' contention that the matrix format is a commonplace feature of Bible code computer software.

**14.** There is a disputed issue of material fact as to whether plaintiff originated this function. *See* Drosnin Supp. Aff. ¶ 4 ("Plaintiff also claims that the ability to display multiple finds in a single matrix is somehow original to it.... At its core, this concept cannot be deemed anything other than functional and is not original.... [O]nce again, Dr. Rips demonstrated this function in Bible [c]ode software to me in June of 1992, before I ever saw plaintiff's Software.").

*Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 72 n. 26 (2d Cir.1994) (emphasis in original). The former is not entitled to the benefit of the merger doctrine, but the latter is.

Here, defendants have not engaged in wholesale copying of plaintiff's compilation (i.e., the Database), but in more limited copying from the Database (e.g., the matrixes). The consequences of giving defendants the benefit of the merger doctrine are not "too destructive of the protection the [Copyright] Act intends to confer on compilations." *Id.* (refusing to apply merger doctrine where competitor placed on its computer database substantial portions of *The Red Book*, a compendium of projections of used car valuations, such that competitor effectively offered to sell its customers *The Red Book* through its database). Just the opposite is true. Withholding the benefit of the merger doctrine would grant plaintiff a monopoly over the idea of a Bible code and seriously impair the policy of the copyright law that seeks to preserve free public access to ideas.

■ In addition, the Software's ability to display multiple Bible code finds in a single matrix is a "process, system, [or] method of operation." *See Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 815 (1st Cir.1995) (holding menu command hierarchy of spreadsheet program to be an unprotectable "method of operation," which "refers to the means by which a person operates something"); *OP Solutions*, 1999 WL 47191, at *16 (holding that organization of computer program's "action grid," which permits grid to retain and display all current and historical actions in a single grid, is an unprotectable method of operation). This function is unprotectable, notwithstanding its expressive elements. *See* 17 U.S.C. § 102(b); *Lotus Dev.*, 49 F.3d at 818 ("[W]hile original expression is necessary for copyright pro-

tection, we do not think that it is alone sufficient [because] [c]ourts must still inquire whether original expression falls within one of the categories foreclosed from copyright protection by § 102(b), such as being a 'method of operation.'"); *see also Altai*, 982 F.2d at 703 ("'Section 102(b) is intended ... to make clear that the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of copyright law.'") (quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. 54, reprinted in 1976 U.S.C.C.A.N. 5657, 5670).

### c. The Software's Algorithm

■ Plaintiff also contends that the Software's algorithm is original because unlike other programs' algorithms, the Software searches for the least common letter of the search term. An algorithm, however, is clearly a method of operation which cannot be protected. *See* 17 U.S.C. § 102(b); *OP Solutions*, 1999 WL 47191, at *16 (stating that elements of a computer program that "describe the way that the program works and the manner in which the user operates the program ... are processes and methods of operation and are unprotectable under § 102(b)."). Moreover, to the extent that this algorithm is the most efficient method of searching for Bible code finds, it is not protectable under the merger doctrine:

> In the realm of computer programs, merger issues may arise in somewhat unusual ways.... Computer searching and sorting algorithms provide good examples of this phenomenon. Any computer system that deals with significant quantities of data will spend much of its operating time engaged in sorting and searching through that data.... [E]fficient methods of sorting are highly de-

sirable.... Where the efficiency trade-offs between methods are substantial, as is often the case, common sense would dictate that a programmer choose the most efficient method.... In such cases, the merger doctrine should be applied to deny protection to those elements· of a program dictated purely by efficiency concerns.

4 Nimmer § 13.03[F][2], at 13–128 to 13–129.[15]

#### d. Removal of Spaces Between Words

■ The Software's ability to disregard spaces between words of the Bible in calculating ELS's and not to display any of these spaces in the matrix does not render the Software protectable. *First,* this function is not sufficiently original· or creative to be worthy of protection. *See* 1 Patry at 335 (stating that the Copyright Office denies registration "to 'mere variations' in typographic ornamentation or lettering and 'arrangement, spacing, juxtaposition of text matter that is involved in book design.'"). *Second,* just like the matrix format, this function is a commonplace feature of Bible code computer software and, therefore, is not protectable. *See* Pl. 56.1 ¶ 10; *see also Brown Bag Software,* 960 F.2d at 1473. *Third,* the Software's ability to exclude spaces between words in searching for ELS's, like the algorithm, is merely an unprotectable method of operation.

In sum, none of the features of the Database or the Software are sufficiently original to merit protection. Plaintiff has failed to satisfy its burden of proving that the Software's outputs of Bible code finds, as displayed in the matrixes, contain protectable expression. Accordingly, defendants' motion for summary judgment is granted.[16]

#### C. The Foreign Law Claims

■ Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over claims that arise under foreign law where "the district court has dismissed all claims over which it has original jurisdiction." Because plaintiff's only federal claim have been dismissed, I decline to exercise supplemental jurisdiction over plaintiff's remaining copyright infringement claims arising under foreign law. *See Martinez v. Simonetti,* 202 F.3d 625, 636 (2d Cir. 2000) (directing dismissal of supplemental claims where no federal claims remained); *Information Res., Inc. v. Dun & Bradstreet Corp.,* 127 F.Supp.2d 411, 418 (S.D.N.Y.2000) (declining to· exercise supplemental jurisdiction over foreign law claim because its application would present sufficiently novel and complex issues of foreign law).

## IV. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted.[17]

---

**15.** Defendants have not created a competing computer program and have not been accused of copying plaintiff's source or object code. Therefore, the originality of the algorithm is irrelevant to the question of whether the matrixes contain any protectable elements.

**16.** Because summary judgment is granted to defendants on the ground that plaintiff's work does not contain protectable expression, I do not address defendants' argument that their reproduction of the Printouts is a fair use.

**17.** Defendants have also moved for an award of prevailing party attorneys' fees pursuant to

17 U.S.C. § 505. This issue will be addressed after the submission of supplemental memoranda.